UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA : | |
| : | Criminal No.  07-135 (JDB) |
| v. : | |
| : | Motions Hearing:    August 31, 2007 |
| THOMAS PETERSON, : | |
| : | |
| Defendant. : | |

**GOVERNMENT'S CONSOLIDATED OPPOSITION TO DEFENDANT'S MOTIONS
TO SUPPRESS EVIDENCE AND TO SUPPRESS STATEMENTS**

The United States, by and through its attorney, the United States Attorney for the District of Columbia, respectfully opposes Defendant's Motions to Suppress Tangible Evidence and Motion to Suppress Statements. As grounds for this Opposition, the United States relies on the following points and authorities and such other points and authorities as may be cited at a hearing on the motions:

**FACTUAL BACKGROUND**

On May 24, 2007, the defendant was charged by Indictment with two counts of Unlawful Possession with Intent to Distribute Five Grams or More of Cocaine Base, in violation of Title 21, United States Code, Sections 841(a)(1) and (b)(1)(B)(iii). The charges arise from an arrest on April 20, 2007 and the execution of a search warrant at the defendant's apartment five days later on April 25, 2007.

On April 19, 2007, at approximately 7:00 p.m., United States Park Police ("USPP") Officer Sam Malamis, who was on duty, was contacted by a confidential source ("source"), whose information had proved reliable, accurate and credible on numerous occasions in the past. The source indicated that he had information about a person engaged in narcotics distribution, and the source told Officer Malamis that the person drove a silver, late-model Chevrolet Impala with gray

interior and blue and white paper tags. The source also said this person usually carried three or four "8 balls" of crack cocaine in a crevice located above the driver's side sun visor, between the headliner and the roof of the Impala. The source described this person as a dark-complected, black, male, transvestite with breast implants. The source provided the additional description that this man was over 250 pounds and between five feet, eight inches and five feet, 10 inches tall. The source further indicated that this man would be in the location of K Street, Northwest, between Third and Fifth Streets, or near the construction site in the 400 block of L Street, Northwest around midnight.

Based on this specific information, Officer Malamis and his partner, Officer Brian Wodzinski, drove to a location near the construction site in the 400 block of L Street, Northwest. At about 12:16 a.m. on April 20, 2007, the source called Officer Malamis on his cellular phone and told Officer Malamis that the man he had described was near the construction site. At about 12:22 a.m., Officer Malamis saw a man fitting the description provided by the source. The man was driving away from the L Street construction site in the Chevrolet Impala that the source had described and there were two passengers in the car with him. Near the intersection of Fourth and K Streets, Northwest, the driver of the Impala failed to maintain a proper lane, in violation of the traffic law in this District, and Officer Malamis initiated a traffic stop near Massachusetts Avenue and Third Street, Northwest.

Following the traffic stop, Officer Wodzinski immediately noticed a crevice between the headliner and the roof, just as the source had described. As Officer Wodzinski stood outside of the vehicle, he looked through the windshield at the crevice and saw a portion of a plastic bag sticking out. Officer Wodzinski also noticed that there was a tint band at the top of the windshield, and there were scratches on the tint near the crevice. The scratches looked like they may have been caused by

items being slid into the crevice.

The officers asked the driver if the car belonged to him, and he said it did. The officers then asked the three occupants of the Impala to step out of the car and the officers called other officers, including an officer with a canine partner trained in narcotics detection, to the scene. The canine reacted excitedly to the area of the driver's seat. Then, Sergeant Keenan, who had arrived on the scene, approached the car, bent down to look at the driver's side floor, and saw a blue zip lock bag containing a white substance which appeared to be cocaine base. The driver of the car and his two passengers were arrested.[1] The driver was identified as the defendant, Thomas Peterson, and he was placed in the back of a police car.

Search incident to arrest, the police recovered from the crevice nine, individually wrapped "8 balls" and more than 50 separate, small zip locks of crack. As the police recovered the drugs from the crevice, and while the defendant was sitting in the back of the police car, the defendant said "it's mine, but it's not real; all that stuff is fake; test it." The officers did field test the drugs they recovered, which field tested positive for cocaine. Thereafter, the "8 balls" and the 50 zip locks of crack were submitted to the Drug Enforcement Administration ("DEA") and determined to be cocaine base, with a net weight of 28.7 grams.

On April 23, 2007, Superior Court Judge Robert Tignor found probable cause to believe that USPP officers would locate contraband at the defendant's home and he authorized a search warrant of the defendant's apartment.[2]

---

[1] Following arrest, the defendant indicated that he lived at 915 Allison Street, Northwest, Apartment 101.

[2] A copy of the search warrant is attached as Attachment A.

On April 25, 2007, at about 7:02 a.m., USPP officers executed the search warrant at the defendant's Allison Street, Northwest, apartment.[3] When the USPP officers arrived at the defendant's two bedroom Allison Street apartment, they loudly knocked on the apartment door and announced their presence three times. About five or six seconds passed between each knock. Each time they knocked, they indicated that they had a search warrant and directed that the occupants of the apartment to open the door immediately. The officers received no response and they heard no sound or movement.

Thereafter, the officers forced entry into the defendant's apartment. Inside, they located the defendant in one bedroom and a another man in a second bedroom. Before they began their search, the officers cleared the location and brought the defendant and the other man into the living room. Although they were not yet arrested, the two men were handcuffed and briefly interviewed for security purposes. As the search was beginning, but before any contraband was recovered, a USPP officer asked the defendant questions aimed at identifying the individuals on the scene. The officer asked the defendant his name, height, weight and whether he had any tattoos. The officer also asked the defendant where he worked, in which room he slept and how long he had lived at the apartment. In response, the defendant said that he had lived in the apartment for about 10 years and that his mother's name is on the lease. He also told the officer which bedroom was his, and he said that he was the only occupant of that bedroom.

Thereafter, police recovered, *inter alia*, cocaine base in the bedroom that the defendant had identified as his own. The cocaine base recovered from the defendant's bedroom was examined by the DEA and determined to have a net weight of 40.7 grams.

---

[3] The affidavit in support of the search warrant is attached as Attachment B.

The Defendant now moves to suppress the tangible evidence recovered on April 20 and 25, 2007, and his statements. Defendant's motions are without merit and should be denied.

## ARGUMENT

I. Officer Malamis Lawfully Stopped the Defendant and Lawfully Seized the Drug Evidence from the Car Defendant was Driving.

At a minimum, the detailed tip from a known, reliable, confidential source provided Officer Malamis with reasonable articulable suspicion to believe the defendant possessed drugs.[4] "The Fourth Amendment does not require a policeman who lacks the precise level of information necessary for probable cause to simply shrug his shoulders and allow a crime to occur or a criminal to escape." Adams v. Williams, 407 U.S. 143, 145 (1972). The legality of such a stop turns on whether the officers'[s] response to the situation was reasonable in light of the totality of the circumstances." United States v. Cortez, 449 U.S. 411, 417-18 (1981); United States v. Smart, 98 F.3d 1379, 1384 (D.C. Cir. 1997).

Here, the totality of circumstances demonstrates that Officer Malamis's stop of the defendant was reasonable. First, the police were given the description, modus operandi, date, approximate hour, car description and precise location of where the defendant engaged in narcotics distribution. Second, the source who gave the police this information was known to them, so that there was

---

[4] Arguably, there was probable cause to arrest the defendant during the initial stop where the reliable source had already provided sufficiently detailed and specific information that the defendant had been engaged in narcotics distribution near the construction site, and where the source had called officers while they were near the construction site to indicate that the defendant was there. See United States v. Riley, 351 F.3d 1265 (D.C. Cir. 2003) (probable cause found where informant had a substantial track record of reliability); see United States v. Vaughn, 830 F.2d 1185, 1187 (D.C. Cir. 1987) (firsthand knowledge of informant's information "increased the probability that it was accurate); United States v. Harris, 627 F.2d 474, 476 (D.C. Cir.) (finding probable cause where informant provided tip describing man dealing drugs, the van from which he was dealing, and the location of the van), cert. denied, 449 U.S. 961 (1980).

accountability for the information. The USPP knew the source for a significant period of time prior to the defendant's arrest, and they judged the source reliable. Third, each detail of the information provided by the source, save the information about the drugs in the crevice, was verified before defendant was stopped.[5] The defendant appeared on the appointed date, time, place, driving the described car. The police corroborated these innocent details. Moreover, the police had prior information from a known reliable source concerning the nature of the illegality in this case -- that the defendant was engaged in narcotics distribution in the construction site area - - not just the innocent details. Combined, these facts provided the indicia of reliability necessary for a Terry stop. See Alabama v. White, 496 U.S. 325 (1990) (finding reasonable articulable suspicion where the information was not as extensive as here, the tip was anonymous as opposed to here and where some of the details could not be verified); see also Adams v. Williams, 407 U.S. 143 (1972).

Moreover, Officer Malamis had reasonable an independent legal basis to stop the defendant because he had committed a traffic violation. Specifically, the officers saw the defendant driving the car, and they saw an improper lane change. Thus, the officers knew that the Defendant had committed a traffic violation. The officer's observation of the traffic offense provided them with grounds to stop the defendant. See United States v. Mitchell, 951 F.2d 1291, 1295 (D.C. Cir. 1991) ("The Fourth Amendment does not bar the police from stopping and questioning motorists when they witness or suspect a violation of traffic laws, even if the offense is a minor one."); see also Pennsylvania v. Mimms, 434 U.S. 106, 109 (1977) ("there is no question about the propriety of" stopping a car for a traffic violation); Delaware v. Prouse, 440 U.S. 648, 659 (1979) ("The foremost method of enforcing traffic and vehicle safety regulations . . . is acting upon observed violations.

---

[5] The information about the crevice was verified once the defendant was stopped.

Vehicle stops for traffic violations occur countless times each day; and on those occasions licenses and registration papers are subject to inspection . . . ."); United States v. Montgomery, 561 F.2d 875, 879 (D.C. Cir. 1977) ("The police may stop and question the driver of a vehicle when an infraction of the motor vehicle code is seen or suspected.").[6]

Once the officers stopped the car, Officer Wodzinski immediately noticed the crevice near the windshield where the defendant was seated, and he saw a plastic bag sticking out of it. This observation further corroborated the information provided by the source, and the officers had further reason to believe the defendant possessed drugs. Once the canine unit was called to the scene, and the dog indicated the presence of drugs in the driver's seat area of the car, where defendant had been seated, the officer's suspicion that the defendant possessed drugs was confirmed, and the police certainly had probable cause to arrest the defendant, and to search the area of the car that was under the defendant's personal control. See Chimel v. California, 395 U.S. 752, 763 (1969); United States v. Holmes, 385 F.3d 786 (D.C. Cir. 2004); United States v. Abdul-Saboor, 85 F.3d 664 (D.C. Cir. 1996). Moreover, under the "plain view" doctrine articulated in Minnesota v. Dickerson, 508 U.S. 366 (1993), the officers had sufficient probable cause to arrest the defendant and conduct a search once Sergeant Keenan saw a blue zip lock bag containing a white substance which appeared to be cocaine base on the driver's side floor. See United States v. Most, 876 F.2d 191 (D.C. Cir. 1989).

---

[6] Additionally, Officer Malamis had a legal basis to order the defendant out of his car. See Maryland v. Wilson, 519 U.S. 408 (1997); Mimms, 434 U.S. at 111.

    II.    The Affidavit in Support of the Search Warrant Provided a Substantial Basis for Probable Cause to Search the Defendant's Apartment.

The task of a judicial officer from whom a search warrant is requested is "to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." Illinois v. Gates, 462 U.S. 213, 238 (1983); see also United States v. Laws, 808 F.2d 92, 94 (D.C. Cir. 1986) (affidavit must set forth sufficient facts to induce a "reasonably prudent person" to believe evidence of crime will be found). This Court should uphold Judge Tignor's decision to issue the warrant because it is supported by substantial evidence. See Massachusetts v. Upton, 466 U.S. 727, 728 (1984) (per curiam).

First, there was substantial evidence in the Affidavit to conclude that 915 Allison Street, Northwest, Apartment 101, was the defendant's dwelling, both at the time of the offense and at the time of the execution of the search warrant. Additionally, at the time of his April 20, 2007 arrest, the defendant had specifically stated that he lived at the Allison Street address.

Second, there was a "fair probability" that the police would recover contraband from the defendant's home. See Illinois v. Gates, 462 U.S. 213, 238 (1983). In his Motion, the defendant argues that there was no reason to believe that evidence of a drug-related crime would be found inside of the defendant's home. See Defendant's Motion to Suppress Evidence Allegedly Seized From Residence ("Motion") at 2-3. Defendant is wrong. In United States v. Thomas, 989 F.2d 1252 (D.C. Cir. 1993), an informant provided information to the police that the defendant was selling crack cocaine in the 900 block of N St., N.W. Subsequently, the police made two undercover buys

in the 900 block of N St., N.W., from the defendant. There was no direct evidence that the defendant sold drugs out of his residence (or stored drugs at his residence). Nevertheless, the police sought and obtained a search warrant for the residence the defendant shared with his wife. In a search of the dwelling, the police recovered the clothing the defendant was wearing at the time of one of the sales to an undercover officer, as well as some of the marked money used in the sale, a magnetic key holder used by the defendant in making the sale, together with a gun and ammunition and two plastic bags containing suspected crack cocaine. Prior to trial, the defendant moved to suppress the tangible evidence of the search, arguing *inter alia* there was insufficient evidence in the affidavit to conclude that there would be evidence of criminal activity in the defendant's home. In rejecting the defendant's argument, the D.C. Circuit observed:

> "[O]ther circuits have held that observations of illegal activity outside of the home can provide probable cause for the issuance of a search warrant for a suspect's house, even in the absence of an allegation that any illegal activity occurred in the home itself. See, e.g., United States v. Riedesel, 987 F.2d 1383 (8th Cir.1993) (lawful seizure of drugs from defendant's car provided probable cause to support issuance of warrant to search his house); United States v. Angulo-Lopez, 791 F.2d 1394, 1399 (9th Cir.1986) (probable cause existed to search defendant's residence, based on reasonable inference that suspected drug dealer would keep evidence at home); United States v. Cruz, 785 F.2d 399, 406 (2d Cir.1986) (probable cause found to search defendant's apartment, although no witness ever saw defendant or his associates use apartment). We agree with these rulings: observations of illegal activity occurring away from the suspect's residence can support a finding of probable cause to issue a search warrant for the residence, if there is a reasonable basis to infer from the nature of

9

the illegal activity observed, that relevant evidence will be found in the residence. Id. at 1254-55.  In this case, the defendant was arrested only days before Judge Tignor signed the search warrant.  As a result, there was probable cause to believe that contraband would be located in the defendant's apartment.  Because, at a minimum, there is substantial evidence in support of Judge Tignor's finding that evidence of criminal activity would be located in the defendant's apartment, the defendant's motion is without merit and should therefore be denied.  See United States v. Hopkins, 128 F. Supp.2d 1 (D.C. Cir. 2000).[7]

Moreover, this Court should uphold the validity of the search warrant Affidavit because, *inter alia*, the Affidavit provided ample reason for Judge Tignor to credit the source, by virtue of the source's track record of supplying reliable information to the police, and it indicated that the police had corroborated the source's claim that the defendant was engaged in drug distribution (i.e., defendant's April 20, 2007 drug arrest) and explained that in the experience of a seasoned and experienced law enforcement officer who signed the Affidavit, persons who illegally possess drugs store evidence, including contraband in their homes.

Finally, even assuming Judge Tignor did not have a substantial basis to find probable cause, suppression of the evidence is not an appropriate remedy since the USPP officers had a good faith basis to execute the search warrant in this case.  See United States v. Leon, 468 U.S. 897, 922 (1984); United States v. Salamanca, 990 F.2d 629, 634 (D.C. Cir.) ("even if [warrant] affidavit did not sufficiently establish a finding of probable cause, the executing officers justifiably relied in good

---

[7]   As we have already discussed, *supra*, the officers reasonably acted on the tips of a confidential source and did not violate the defendant's rights during the April 20, 2007 arrest and recovery of evidence.  Thus, defendant's argument that the evidence seized from the defendant's apartment on April 25, 2007 should be suppressed as "poisonous fruit" must fail.  See Defendant's Motion at 3-4.

faith on the magistrate's determination that probable cause existed"), cert. denied, 510 U.S. 928 (1993).

>    III.   There was No Violation of the Knock and Announce Statute and Suppression is Not a Remedy for Such a Violation in Any Event.

The touchstone for Fourth Amendment analysis of government action is reasonableness. See United States v. Ramirez, 523 U.S. 65, 71 (1998). The common law knock-and-announce principle forms part of the Fourth Amendment reasonableness inquiry. See Wilson v. Arkansas, 514 U.S. 927, 930 (1995). Title 18, United States Code, Section 3109 provides, in pertinent part, that an officer may break open any outer or inner door of a house, if, "after notice of his authority and purpose, he is refused admittance or when necessary to liberate himself or a person aiding him in the execution of the warrant." The phrase "refused admittance" has been interpreted to permit forced entry if police are denied entry to the home, either affirmatively or constructively, after announcing their presence. See United States v. Spriggs, 996 F.2d 320, 322 (D.C. Cir. 1993) (citing United States v. Bonner, 874 F.2d 822, 824 (D.C. Cir. 1989)); see also United States v. Kemp, 12 F.3d 1140, 1141 (D.C. Cir. 1994) ("Notice and refusal are preconditions of a lawful 'breaking' by the police, absent exigent circumstances"). Whether police officers reasonably complied with the knock-and-announce rule is "a function of the facts" of a case, and a court must examine "the totality of [the] circumstances." United States v. Banks, 540 U.S. 31, 36 (2003).

Here, there was no violation of the knock-and-announce rule. In this case, the totality of the circumstances indicates that the officers had been refused admittance by the time they resorted to forcing entry. First, the officers loudly knocked and announced their presence, and they waited five or six seconds between each knock. When the police repeatedly knock, announce their identity and

intention to execute a search warrant, and demand that the occupants open the door, one would expect to hear some acknowledgment from within a two-bedroom apartment. The silence suggested that the occupants of the apartment were deliberately ignoring the police presence. See United States v. Wood, 879 F. 2d 927, 933 (D.C. Cir. 1989); Jackson v. United States, 354 F.2d 980, 982 (1st Cir. 1965). Second, the officers knocked at 7:02 a.m., a time when the sun has risen and when most people are either awake or are at least starting to stir. The fact that the execution of the search warrant occurred in the early morning hours suggests that the occupants intentionally failed to respond to the officers. The amount of time the officers waited before forcing entry, together with other circumstances, is sufficient to establish constructive refusal. Moreover, even if the officers had failed to comply with the requirements of Title 18, United States Code, Section 3109, suppression is not an appropriate remedy where, as here, the evidence was seized pursuant to a valid warrant and would have been discovered even if the officers had delayed entry into the premises. See Hudson v. Michigan, 126 S. Ct. 2159 (2006).

    IV.    The Defendant's Statements Are Admissible Against Him

On April 20, 2007, as the police recovered the drugs from the crevice in the car defendant had been driving, and while the defendant was sitting in the back of the police car, the defendant was not subject to police interrogation. When the defendant said "it's mine, but it's not real; all that stuff is fake; test it," the police had not asked him any questions. See Rhode Island v. Innis, 446 U.S. 291 (1980). The defendant's statements were spontaneous and unsolicited. Additionally, the circumstances do not indicate that the defendant's statements were involuntary. There is no evidence that he was coerced, physically abused, or otherwise compelled to make these statements. See Colorado v. Connelly, 479 U.S. 157, 167 (1986); Brown v. Mississippi, 297 U.S. 298 (1936). To

the contrary, his statements suggest that he was fully aware of what was going on and was attempting to provide an excuse as he saw the officers recovering his drugs.

On April 25, 2007, the defendant was not in custody nor was he subject to interrogation when he told police which room was his and how long he had lived at the apartment. "[A] warrant to search for contraband founded on probable cause implicitly carries with it the limited authority to detain the occupants of the premises while a proper search is conducted." Michigan v. Summers, 452 U.S. 692, 705 (1981). The fact that a person has been lawfully seized under Summers does not mean that the occupant is in "custody" for purposes of the Fifth Amendment and Miranda. To the contrary, "[a] person detained during the execution of a search warrant is normally not in custody for Miranda purposes." United States v. Saadeh, 61 F.3d 510, 520 (7th Cir.), 516 U.S. 990 (1995); United States v. Bennett, 329 F.3d 769, 774 (10th Cir.2003). Additionally, the defendant was not subjected to interrogation in that the officer simply gathered basic biographical information from the defendant. As a general rule, "[r]equests for routine information such as name and address, which is necessary for basic identification purposes, is not interrogation for purposes of Miranda." United States v. Jones, 266 F.3d 804, 812 (8th Cir. 2001); see also Pennsylvania v. Muniz, 496 U.S. 582 (1990). The mere fact that biographical information turns out to be incriminating in a particular case does not transform the request for that information into "interrogation." See United States v. Gotchis, 803 F.2d 74 (2d Cir.1986). At the time the defendant was questioned, the search of the house had not been conducted and no contraband had been found. The questioning officer had no information as to who the individuals in the residence were, or what connection they had to the location, thus, the foreseeability that the defendant's responses to basic biographical questions might be "directly relevant" to an offense that might later be charged was simply not so great as to preclude

police executing the search warrant from undertaking customary and routine recordkeeping about who was present in the house and who owned the premises. Accordingly, the Defendant's statements were not unlawfully obtained.

## **CONCLUSION**

WHEREFORE, the United States respectfully submits that Defendant's Motions to Suppress Evidence and Statements should be denied.

                Respectfully submitted,

                JEFFREY A. TAYLOR
                United States Attorney
                D.C. Bar No. 498610

                /s/
                PRECIOUS MURCHISON
                Assistant United States Attorney
                Maryland Bar
                555 Fourth Street, N.W.
                Washington, D.C. 20530
                (202) 307-6080

*[handwritten annotations top left: M-C 070203; 2007 4/23/07]*

# SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
## SEARCH WARRANT

TO: __Chief, United States Park Police or any other sworn law enforcement officer__
(Specific law Enforcement Officer or Classification of Officer of the Metropolitan Police Department or other Authorized Agency)

AFFIDAVIT, herewith attached, having been made before me by __Ofc. Peter J. Ward (ID# 176)__ that he has probable cause to believe that in the __premises__ known as __915 Allison Street NW, Apartment 101, Washington, DC described more fully in Attachment "A" of the affidavit in support of this search warrant,__ in the District of Columbia, there is now being concealed property, namely __documents, weapons, narcotics, and other contraband more specifically described in Attachment "B" of the affidavit in support of this search warrant.__

WHICH IS __in violation of D.C. Code §48-904.01(a)(1)__ and as I am satisfied that there is probable cause to believe that the property so described is being concealed on the above designated __premises__ and that the foregoing grounds for issuance of the warrant exist.

*[handwritten: 3 days - ie. by 5pm 4/26/07  RST]*

YOU ARE HEREBY AUTHORIZED within ~~10~~ days of the date of issuance of this warrant to search in the daytime/at any time of the day or night, the designated __premises__ for the property specified, and if the property be found there

YOU ARE COMMANDED TO SEIZE IT, TO WRITE AND SUBSCRIBE in an inventory of the property seized, to leave a copy of this warrant and return, and to file a further copy of this warrant and return with the Court on the next Court day after its execution.

Issued this __23rd__ day of __April__, 20__07__   _____
Judge, Superior Court of the District of Columbia

---

## RETURN

*[handwritten: PW]*

I received the above warrant on __April 23__, 20__07__ and have executed it as follows: On __April 25__, 20__07__ at __0702__ A.M., I searched the __premises__ described in the warrant and I left a copy of the warrant and return with __Thomas Edward Peterson, JR__ properly posted.
(name of the person searched or owner, occupant, custodian or person present at place of search)

The following is an inventory of the property taken pursuant to this warrant:
Crack Cocaine, Marijuana, US Currency $550.00, Picture of "Barber", Mail Matter, Documents, Marijuana Pipe, Ruger Semi automatic handgun (no serial #), Ammunition, Magazine for unknown weapon, Digital scale, Plastic ziplock bags, Bullet Resistant vest, Court Papers (DC) for "Peterson" and "Barber", Razor Blade, Pen Barrel, 3 cellphones, Plate

*[signature: Peter J Ward]*

This inventory was made in the presence of __Inv. A. Kewess, Inv. O. Hurley__

I swear that this is a true and detailed account of all property taken by me under this warrant.

_____
Executing Officer

Subscribed and sworn to before me this _____ day of _____, 20____

_____
Judge, Superior Court of the District of Columbia

Form CD(17)-1055/Mar 89
9-2794 wd-234

# SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
# AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR A SEARCH WARRANT

**915 Allison Street NW**
**Apartment 101**
**Washington, DC**

Your affiant, Peter J. Ward, being duly sworn, hereby depose and say that:

1. Your affiant is an Officer with the United States Park Police, Criminal Investigations Branch, Narcotics and Vice Unit. Your affiant is a twenty-one year member of this department with experience in over 200 narcotic-related arrests. Your affiant has experience in the preparation and execution of search warrants. Your affiant has received narcotics training provided by the Federal Law Enforcement Training Center in Brunswick, Georgia and United States Park Police. Your affiant was trained as a criminal investigator at the Federal Law Enforcement Training Center in Brunswick, Georgia. Through experience and training, your affiant has knowledge of various methods and tools used by narcotics dealers, to include ways of packaging and distributing narcotics and other illegal drugs, concealment and transportation of same, firearms, ammunition and related maintenance tools and paraphernalia, as well as documents, whether electronic or paper, possessed and used by narcotics dealers. This affidavit is based on the personal knowledge, observations, and investigations conducted by your affiant and other members of the United States Park Police. It does not contain every material fact that I have learned during the course of this investigation, however, no information known to me that would tend to negate probable cause has been withheld from this affidavit.

2. Based on training, experience, and participation in narcotics investigations, your affiant believes that drug traffickers maintain books, receipts, records, and other papers relating to the transportation, ordering, sale and distribution of controlled substances. Furthermore, your affiant knows that the aforementioned books, records, ledgers, airline

1                                                         Initials _____

tickets, money orders, bank records and other documents are generally maintained where the traffickers have ready access to them; namely, in their residences, places of business, and vehicles. Furthermore, based upon your affiant's training and experience in the investigation of narcotics trafficking, your affiant believes that drug dealers commonly use firearms and other weapons to protect their illegal activities. Furthermore, it is common for drug traffickers to maintain paraphernalia for packaging, cutting, weighing and distributing drugs, including but not limited to scales, plastic bags, sifters, strainers, stamps, spoons, tape and cutting agents.

3. Based on training, experience, and participation in narcotics investigations, your affiant knows that it is common for significant dealers to secrete contraband, proceeds of drug sales, firearms, firearm related supplies and records of drug transactions in secure locations within their residence, business locations and automobiles for ready access and to conceal the same from law enforcement authorities. In order to accomplish this concealment, narcotics traffickers frequently build "stash" places within their residences or businesses.

4. Furthermore, it is common for drug dealers to take or cause to be taken photographs of them, their associates, their property and their residence and residence of their associates. These items are generally maintained where the individuals have ready access to them; namely, in their residences, places of business, and vehicles. These items are generally maintained where the individuals have ready access to them; namely, in their residences, places of business, and vehicles.

5. Based on your affiant's training, experience, and participation in narcotics investigations, your affiant knows that narcotics traffickers often place assets in names other than their own to avoid detection of these assets by government agencies, but maintain control of these assets at their residence and business.

2                                                                                    Initials

6. Furthermore, drug traffickers often attempt to legitimize their profits by investing in financial instruments, jewelry, rare coins, or by placing the assets in banks, securities, brokerage house, real estate, shell corporations, and business fronts. Records and documents of these items are generally maintained where the individuals have ready access to them; namely, in their residences, places of business, and vehicles.

SUMMARY OF INVESTIGATION

7. On the evening of April 19, 2007, a registered United States Park Police confidential informant (CI), whose information has proved to be reliable on numerous occasions in the past, contacted Officer S. V. Malamis (USPP# 0240). The CI stated to Officer Malamis that there was an individual engaged in narcotics distribution that the CI described as a dark complexioned black male transvestite, between 5'8" and 5'10" tall, and weighing more than 250 pounds. This individual was later identified as: Thomas Edward PETERSON, Jr. (PETERSON), a black male, 5'10" in height, 265 pound in weight and having a date of birth of January 22, 1976. The CI stated that PETERSON drove a silver late-model Chevrolet Impala with gray interior and displaying blue and white paper license tags, The CI stated that PETERSON could be found between 3rd and 5th Streets around K Street NW, Washington, DC, or in the construction site in the 400 block of L Street NW, Washington, DC around midnight. The CI also stated that PETERSON usually had three or four "8-balls" of crack secreted in a crevice above the driver's sun visor, between the headliner and the roof of the Impala. On April 20, 2007 at approximately 12:22 a.m., Ofc. Malamis observed PETERSON drive a vehicle, that matched the description provided by the CI, leave the L Street construction area in the vehicle. PETERSON was the operator and there were two other occupants.

8. Ofc. Malamis observed a traffic violation (Fail to maintain lane.) and stopped the vehicle eastbound Massachusetts Avenue at 3rd St. NW, Washington, DC. Upon contact

3                                                                Initials _____

with the vehicle, Ofc. Wodzinski, who was assisting Ofc. Malamis, immediately observed a gap between the headliner and the roof as described by the CI. A certified and trained United States Park Police drug detection canine ("Ronin") was called to the scene and the canine's handler Ofc. Minnick stated that "Ronin" indicated that there were drugs in the vehicle through the open driver's door window. A subsequent search of the vehicle resulted in the discovery of approximately 38 grams of crack cocaine. In the headliner, in the area described by the CI, 54 small individual plastic zip lock bags containing an off-white substance and 9 larger chunks of an off-white substance in clear plastic bags was recovered. One small plastic zip lock bag with an off-white substance was found under the driver's seat. Ofc. Malamis field test portions of these substances and they tested positive for cocaine base. PETERSON and the two other occupants of the vehicle were placed under arrest.

9.  At the time of arrest, PETERSON stated that his address was: 915 Allison Street NW, Apartment 101, Washington, DC. PETERSON has told the DC Probation Department that he lives at 915 Allison Street NW, Apartment 101, Washington, DC. I spoke with PETERSON's probation officer (Miguel Jorge) on April 20, 2007. Mr. Jorge stated that PETERSON listed his address as 915 Allison Street NW, Apartment 101, Washington, DC. Mr. Jorge stated that PETERSON was there on January 31, 2007 when he did a home visit at 915 Allison Street NW, Apartment 101, Washington, DC. On April 23, 2007 Mr. Shuman, Station Manager of the Lamont-Riggs Post Office, Washington, DC stated to me that the regular mail carrier for 915 Allison Street NW, Apartment 101, Washington, DC, stated that PETERSON receives mail at that address. "Accurint" a private information service company has records that indicate that PETERSON resides at 915 Allison Street NW, Apartment 101, Washington, DC.

10. PETERSON has an arrest record that includes charges for possession and distribution of cocaine.

4                                                              Initials

11. Given that PETERSON was in possession of a quantity of crack cocaine packaged in a manner more consistent with distribution than use, that the CI provided accurate information regarding PETERSON's narcotic distribution activities, that there are multiple sources that corroborate that 915 Allison Street NW, Apartment 101, Washington, DC is PETERSON's residence and the other aforementioned information; I believe that there is probable cause to believe that PETERSON resides at 915 Allison Street NW, Apartment 101, Washington, DC, that PETERSON distributes drugs and that there is evidence related to PETERSON's ongoing criminal activities secreted inside the premises known as: 915 Allison Street NW, Apartment 101, Washington, DC; more fully described in Attachment "A". Your affiant respectfully requests a search warrant for this residence to search for secreted fruits, evidence and instrumentalities of the above-listed crime, which are more particularly described in Attachment "B".

*Reviewed by Barry Wiegand*

SUBSCRIBED AND SWORN TO BEFORE ME THIS

____ DAY OF _____, 20__

_____
JUDGE, SUPERIOR COURT, DISTRICT OF COLUMBIA

5                                                                   Initials _____